Kathryn LLEWELLYN–JONES, Mark Llewellyn–Jones, Caroline Jones, Peter Green, Lesley Green, Said Fadel a/k/a Saeed Fadhl, Warren Grover, and Margaret Joyce Grover, Plaintiffs,

v.

METRO PROPERTY GROUP, LLC, Metro Property Management, LLC, Global Power Equities, LLC, Apex Equities, Sameer Beydoun, Ali Beydoun, Tarek Mahmoud Baydoun a/k/a Tarek M. Baydoun, a/k/a Tarek Beydoun, Baydoun Law Group, PLLC, d/b/a The Meridian Law Group, Mike Alaweih, David Makki, Chris Picciurro, Kathy Messics, George Vanderburg, Allen Brothers Attorneys and Counselors Professional Limited Liability Company, James Allen, and John Allen, Defendants.

and

Metro Property Group, LLC, Counter-plaintiff,

v.

Kathryn Llewellyn–Jones, and Mark Llewellyn–Jones, Counter-defendants.

Case No. 13–11977.

United States District Court, E.D. Michigan, Southern Division.

Signed May 27, 2014.

Deborah K. Schlussel, Law Offices of Deborah K. Schlussel, Southfield, MI, for Plaintiffs/Counter-defendants.

Darryl Bressack, David H. Fink, Fink Associates Law, Bloomfield Hills, MI, Dennis M. Barnes, Sharon M. Woods, Barris, Sott, Detroit, MI, Michael J. Sullivan, Collins, Einhorn, Southfield, MI, for Defendants/Counter-plaintiff.

## OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS TO STRIKE AND DISMISS, AND SCHEDULING CASE MANAGEMENT CONFERENCE

DAVID M. LAWSON, District Judge.

The plaintiffs, all foreign nationals, have filed a complaint against a variety of defendants alleging that they were fraudulently induced into investing in rental properties in the City of Detroit with false promises that the homes were refurbished, approved under a federal housing program standard, already tenanted, and would yield a specific rate of return each year. Presently before the Court are motions by four groups of defendants to dismiss and to strike certain irrelevant and inflammatory allegations from the complaint. For reasons discussed in detail below, the motions to dismiss will be granted in part and denied in part. The motions to strike will be granted.

### I.

According to the complaint, the plaintiffs are citizens of the United Kingdom, the Republic of Yemen, or Australia. The institutional defendants—Metro Property Group, LLC, Metro Property Management, LLC, Apex Equities, LLC and Global Power Equities, LLC—are all Michigan limited liability companies with their primary place of business in Dearborn, Michigan. The individual defendants are all Michigan citizens. The plaintiffs allege that the institutional defendants are the single largest purchasers of foreclosed Detroit homes.

Defendant Sameer Beydoun is a Dearborn resident and the chief executive officer of Metro Property Group, LLC, Metro Property Management, LLC, Global Power Equities, LLC, and Apex Equities, LLC. The plaintiffs allege that defendant Ali Beydoun is a Dearborn resident and also the chief operating officer and executive director of Metro Property Group, LLC. Defendant Mike Alaweih is the vice president of construction services for Metro Property Group, LLC and a member of Apex Equities, LLC. Defendant David Makki is the vice president of real estate services for Metro Property Group and a Dearborn resident. Defendant Chris Picciurro was the chief financial officer of Metro Property Group, LLC, and a resident of Harrison Township. Defendant Kathy Messics is the client care director of Metro Property Group and a resident of Westland. Defendant George Vanderburg was the director of tenant relations of defendant Metro Property Group and a Ferndale resident. Defendant Tarek Mahmoud Baydoun is an attorney and was the general counsel for defendants Metro Property Group, LLC, Metro Property Management, LLC, Global Power Equities, LLC, and Apex Equities, LLC, and was "of counsel" to defendant Allen Brothers, Attorneys and Counselors, Professional Liability Company. Baydoun is also a political pollster and is often featured on Fox 2 News television. Defendant Baydoun Law Group, PLLC is a Michigan limited liability company that does business under the assumed name of the Meridian Law Group. Defendant Allen Brothers Attorneys and Counselors Professional Liability Company (PLLC) is a limited liability company with an office in Detroit; defendants James and John Allen were members of the firm.

As mentioned above, four groups of these defendants have filed motions to dismiss and strike certain allegations. One group consists of Metro Property Group, LLC, Metro Property Management, LLC, Apex Equities, LLC, and Global Power Equities, LLC (the Metro Property defendants). The next group consists of Ali Beydoun, Sameer Beydoun, David Makki, Mike Alaweih, and Kathy Messics (the Beydoun defendants). The third group is Tarek Mahmoud Baydoun and Baydoun Law Group, PLLC (the Baydoun Law defendants). Finally, the fourth group is comprised of John Allen, James Allen and Allen Brothers, PLLC (the Allen defendants). All four groups raise common arguments, plus additional arguments specific to each group of defendants.

The complaint itself is a prolix document consisting of 371 paragraphs separated into thirteen counts, spanning 116 pages. It makes reference to dozens of exhibits, but none are attached to the complaint on file with the Court. The plaintiffs allege generally that the defendants engaged in a scheme that defrauded the plaintiffs of their retirement funds and pensions; they characterize the scheme as a Ponzi scheme, although the means of the fraud alleged suggest that the characterization is inaccurate. The plaintiffs contend that the defendants have purchased thousands of foreclosed homes in Detroit for prices ranging from $500 to $5,000 and make profits by defrauding investors, including the plaintiffs, into buying those homes for prices ranging from $40,000 to $50,000. The plaintiffs allege that the defendants knew that the homes, even if refurbished, are nearly unrentable; those that are rented cannot cover the costs of repairs.

The plaintiffs allege that the defendants did not refurbish the homes or make any attempt to bring them up to building code requirements for a certificate of occupancy or to the requirements for habitability under federal housing programs. The plaintiffs accuse defendant Mike Alaweih, the construction project manager for the LLC defendants, of deliberately failing to refurbish their homes, leading to thousands of dollars of fines and repair costs. And they contend that even if refurbished, the homes generally were not tenanted.

The plaintiffs believe that part of the defendants' scheme is to market the homes to third parties—primarily foreign investors—that are unable or unlikely to view the properties prior to purchase. They say that on the few occasions that foreign investors visit Detroit, the defendants show the investors, including the plaintiffs, properties that have been refurbished, but are staged fraud. The defendants have, on occasion, sent the plaintiffs photographs of the insides of homes that the plaintiffs allegedly purchased, but the plaintiffs say the photos are fraudulent: they are not of the same homes; or promised repairs were never made.

The defendants marketed homes to overseas buyers, including the plaintiffs, as refurbished, already tenanted, and up to federal housing standards. But the plaintiffs allege that the defendants falsely guaranteed verbally and in writing that the homes were "turnkey properties," told prospective buyers that the homes provide immediate cash flow, described the tenants to prospective buyers, and provided potential buyers, including the plaintiffs, with the renters' financial information and financial status. The plaintiffs say that all of that information was false.

After selling the properties to the plaintiffs, the defendants were to manage, repair, and prosecute evictions for the properties. But, the plaintiffs allege, the repairs were never done, fraudulent evictions of non-existent, fictional tenants were conducted, and the defendants billed

the plaintiffs for fraudulent management and evictions of non-existent tenants. The defendants allegedly also charged the plaintiffs hundreds of thousands of dollars for repairs that should have been done before the sale, since the homes were marketed as habitable.

One of the plaintiffs says that when he challenged some of the defendants, Tarek Baydoun, another defendant, threatened the plaintiff with criminal proceedings, citing his experience as a Wayne County Prosecutor's office intern. The plaintiffs allege that defendant Tarek Baydoun fraudulently engaged in the pretense of evicting the non-existing tenant from the property. Baydoun also supposedly evicted the paying tenant as a trespasser in order to conceal the fact that the actual tenants were paying much lower rents than were represented in the fraudulent leases. The plaintiffs allege that defendant Tarek Baydoun also knowingly participated in marketing and selling the fraudulent scheme and appears on video at a marketing session.

The plaintiffs contend that the scheme worked initially because the defendants typically paid the home buyers, including the plaintiffs, higher rent for several months, even though there was no tenant or a different tenant than the person named on the fraudulent lease. After several months, the defendants allegedly told the homeowners, including the plaintiffs, that the tenant stopped paying rent and had to be evicted or that the tenant moved out and no rent is forthcoming. In most cases, the defendants never sought a new tenant and the property became worthless, according to the investor-plaintiffs. Defendants Sameer Beydoun, Ali Beydoun, David Makki, and Kathy Messics are accused of supplying fraudulent, forged lease documents for non-existent tenants to prospective buyers and current homeowners to whom they sold the homes and now manage. Defendants Sammer Beydoun, Kathy Messics, and George Vanderburg supposedly forged the fraudulent lease documents. The plaintiffs say that defendants Sameer Beydoun, Ali Beydoun, David Makki, and Kathy Messics lied about tenants and the conditions of properties. And the role of defendant Chris Picciurro was to supply false information routinely about rental payments and amounts. The plaintiffs contend that when they looked into the matter, they often discovered that the homes were in severe disrepair, never had a tenant, or had a tenant that was paying less rent than what the defendants represented and was different than the individual named on the lease.

The plaintiffs allege that the defendants represented to them that the homes were "Section 8 approved," see 42 U.S.C. § 1437f; 24 C.F.R. §§ 811.101–888.115, but in almost all cases, a Section 8 audit was never done for the home and a Section 8 contract was never entered into because the homes would not pass a Section 8 audit. In some cases, they say, after the plaintiffs demanded to see the Section 8 audit or contract, a Section 8 audit or contract was post-dated and apparently fraudulent. In other cases, the plaintiffs were fined thousands of dollars for failing Section 8 requirements, including a $5,761.80 fine levied against plaintiffs Kathryn Llewellyn–Jones and Mark Llewellyn–Jones.

The plaintiffs purchased homes from defendants Sameer Beydoun, Ali Beydoun, David Makki, and Mike Alaweih, doing business as defendants Metro Property Group, LLC, Metro Property Management, LLC, Apex Global Properties, LLC, and Global Power Equities, LLC. The plaintiffs accuse defendants Tarek Baydoun, Chris Picciurro, Kathy Messics, and

George Vanderburg of conspiring with the Metro Property defendants in the fraudulent home sales, management, legal work, and evictions to carry out the fraudulent scheme. The plaintiffs allege that defendants Sameer Beydoun, Ali Beydoun, David Makki, and Mike Alaweih induced the defendants into purchasing the homes with verbal and written promises and guarantees that the homes were entirely habitable, completely refurbished, turnkey properties that met Section 8 requirements for federal government housing when, in almost all cases, the homes were in disrepair, not refurbished, barely habitable or completely uninhabitable, not up to the minimum requirements for Section 8 housing, and not subject to Section 8 audits. The complaint states that in several cases, the defendants further defrauded the plaintiffs by informing them that the homes were occupied by tenants that were paying a specific amount of rent, showing plaintiffs fraudulent leases for fictional tenants paying a fictional amount of rent. The plaintiffs contend that the leases were forged and the tenants on the leases did not exist. They say that the signature of defendant Sameer Beydoun appears on the fraudulent leases and defendant George Vanderburg's signature appears on several forged documents.

The plaintiffs allege that when they discovered the fraudulent scheme, the defendants continued to lie to them. Plaintiff Kathryn Llewellyn–Jones discovered that the defendants were advertising lower rents in an online listing for several of the properties that she purchased. When she questioned defendants Ali Beydoun and Kathy Messics about those listings, the defendants told her that the listings were incorrect.

The plaintiffs allege that Tarek Baydoun, who served as general counsel for the Metro Property defendants, participated and conspired with the other defendants, and billed several plaintiffs for fraudulent evictions of non-existent tenants from plaintiffs' properties and evictions of non-existent trespassers in order to conceal the fraudulent scheme. They also allege that Tarek Baydoun threatened the plaintiffs with criminal prosecution when they asked questions about the fake evictions and fraud. The plaintiffs also allege that James Allen sent threatening messages to the plaintiffs. They also allege that James Allen, John Allen, and Allen Brothers attempted to conceal Baydoun's relationship with them by removing his name from the Allen Brothers' website on October 1, 2012, when Tarek Baydoun and the Baydoun Law Group actually remained within the Allen Brothers law office, maintained an "of counsel" relationship with the Allen Brothers, and Tarek Baydoun continued to write in the Arab American News on behalf of the Allen Brothers.

The allegations that offend many of the defendants, and are the subject of the motions to strike, are claims that Tarek Baydoun openly has praised and defended Hezbollah, which the plaintiffs note has been named a "Specially Designated Global Terrorist Entity" by the United States Department of Treasury; and that Tarek Baydoun is a former employee of Al–Mabarrat Charitable Organization, a Dearborn, Michigan charity that is the United States affiliate of the Lebanon-based Hezbollah charity, Al–Mabarrat, when the charity was raided by the FBI for allegedly sending money to Hezbollah. The plaintiffs state in their complaint that on Facebook, Tarek Baydoun repeatedly promoted the Lebanon-based Hezbollah charity, Al–Mabarrat, and he asked his Facebook friends and followers to donate to the charity for his twenty-fifth birthday. The plaintiffs also say that defendants Tarek Baydoun, Sameer Beydoun, Ali Beydoun,

David Makki, and Mike Alaweih are all from families that are well known as prominent supporters and members of Hezbollah; and that defendants Sameer Beydoun, Ali Beydoun, David Makki, and Mike Alaweih hired Tarek Baydoun as their attorney because they knew he openly supported Hezbollah. The plaintiffs fear that the money from which they have been defrauded has been laundered to Hezbollah.

The plaintiffs allege that the defendants marketed a home located at 16527 Griggs Street in Detroit to plaintiffs Kathryn Llewellyn–Jones and Mark Llewellyn–Jones, using a document entitled property information. The document stated that the home is "[c]urrently rented to a pre-screened, up-to-date tenant for $900 per month" and guaranteed the buyer of the home, "[g]ross yearly income [of] $10,800," "[n]et annual rent [of] $7,820," and "[n]et [y]ield = 17.4%." Compl. ¶ 66. The document also noted eight significant repairs to the home that the defendants allegedly made. The defendants informed the plaintiffs that the property was occupied by a tenant that signed a lease for $900; but, it is alleged, this lease turned out to be fraudulent and forged. The defendants also informed plaintiffs Kathryn and Mark Llewellyn–Jones that the property was Section–8–approved and that the tenant lived there pursuant to Section 8 approval. These plaintiffs purchased the property from defendant Global Power Equities, LLC on June 15, 2011 for $42,500, they say, based on these documents and representations. The plaintiffs also signed a "Management Agreement" with defendant Metro Property Management, LLC and defendant Sameer Beydoun. But in August 2011, plaintiff Kathryn Llewellyn–Jones discovered a rental list belonging to defendant Metro Property Group, which advertised the property as available for rent at $800 even though the defendants

informed the plaintiffs Kathryn and Mark Llewellyn–Jones that the property was already rented at $900. The plaintiffs soon learned that the lease they had been told about was fictional, fraudulent, and forged and there was, in fact, no tenant renting or living at the property.

Plaintiff Kathryn Llewellyn–Jones alleges that she immediately contacted defendant Ali Beydoun to inquire about the discrepancy and was told that the list belonged to another agent over whom he had no control. The plaintiffs later learned that the defendants created and posted the rental. Defendant Ali Beydoun allegedly told Llewellyn–Jones that he did not know why the properties were advertised at the lower rents, but that he had the signed lease in front of him for the property located at 16527 Griggs Street for a rental rate of $900 per month and that the tenant had moved in on May 1, 2011. After Ali Beydoun sent this response to Llewellyn–Jones, defendant Kathy Messics, the client care director of Metro Property Group, LLC, accidentally sent plaintiff Kathryn Llewellyn–Jones an email message addressed to Ali Beydoun telling him that the plaintiff had not been fooled by his false explanations of the rental listing and that they needed to make up a more credible fraudulent story to further cover up the ongoing scheme.

Llewellyn–Jones alleges that the defendants repeatedly failed to present the lease to her despite her repeated requests. Messics finally sent a lease dated May 1, 2011 signed by defendant Sameer Beydoun and a tenant named Paula Sinclair with a monthly rental rate of $900. Defendant Messics also told Llewellyn–Jones that the tenant had paid a security deposit equivalent to one month's rent. Plaintiffs Kathryn and Mark Llewellyn–Jones soon learned that the lease was fraudulent and forged: no tenant lived at the property

and the defendants allegedly paid the plaintiffs $900 rent out of the funds that the plaintiffs paid for the home in the first place.

In June 2012, Kathryn Llewellyn–Jones and Mark Llewellyn–Jones received a rental statement for May 2012, showing a payment of only $750 for the property, $150 below the rental rate on the lease for the property. When Kathryn Llewellyn–Jones inquired about the lower rent, the defendants informed her that the Section–8 allowance for the property dropped to $750, which the plaintiffs allege was false.

The plaintiffs also requested a copy of the Housing Assistance Payments contract (HAP) from defendant David Makki, the vice president of real estate services for Metro Property Group, LLC. Makki sent the plaintiffs a partial HAP document and refused to provide the plaintiff with the full document. The portion of the lease that Makki sent recited a beginning date of November 28, 2011, much later than the lease the defendants sent the plaintiff for the property, which was May 1, 2011. Additionally, the portion of the lease that Makki sent the plaintiffs shows a rental rate of $750 per month, not $900 as specified on the original lease. In an email message, Makki told the plaintiffs that the tenant had been making a $150 per month contribution to the rent and had been told she was no longer allowed to do so or she would lose all of her Section–8 funding. Llewellyn–Jones alleges that this was a deliberate attempt to mislead her and stop her from discovering the scheme. Kathryn Llewellyn–Jones says that a third party she asked to investigate reported that the tenant stated that she had reserved the property in August 2011 and did not move in or begin paying rent until the end of November 2011. The tenant stated that the home was not habitable when she moved in, and the rent for the property had always been $750 per month and she had never contributed $150 or been ordered to stop paying a contribution per month toward the rent.

The plaintiffs make similar allegations about several other homes that plaintiffs Kathryn and Mark Llewellyn–Jones purchased, including properties at 2938 Burlingame Street and 18257 Lauder Street in Detroit. Plaintiffs Caroline Jones purchased three homes, plaintiffs Peter and Lesley Green purchased a home at 19013 Indiana Street, Said Fadel purchased a home located at 14846 Washburn Street, and plaintiffs Warren Grover and Margaret Joyce Grover purchased homes located at 5290 Balfour, 18940 Sawyer, and 7666 Brace Streets, all in Detroit. They make similar allegations concerning false leases and representations about repairs, tenants, and rates of return.

The plaintiffs advance thirteen counts in their complaint: fraudulent misrepresentation as to all defendants (count I); fraudulent inducement as to all defendants (count II); breach of contract as to all defendants (count III); unjust enrichment as to all defendants (count IV); "Alter Ego" (count V); "Corporate Officer Responsibility/Liability" (count VI); "Alter Ego" as to the attorney defendants (count VII); "Corporate Officer Responsibility/Liability" as to the attorney defendants (count VIII); common law conversion as to all defendants (count IX); statutory conversion as to all defendants (count X); violation of the Michigan Uniform Trade Practices Act and Consumer Protection Act as to all defendants (count XI); violation of the Racketeer Influenced and Corrupt Organization Act (RICO) as to all defendants (count XII); and intentional infliction of emotional distress as to all defendants (count XIII). All four groups of defendants argue that counts I, II, IX, X, XI and XII must be dismissed because they

are barred by the economic loss doctrine. They also contend that the fraud claims must be dismissed because they are not pleaded with the particularity required by Federal Rule of Civil Procedure 9(b), and the fraud counts fail to state a claim. They state the same with respect to the conversion counts. The defendants all contend that the Michigan Uniform Trade Practices Act count must be dismissed because the case does not involve the sale of goods. The count under the Michigan Consumer Protection Act must be dismissed, say the defendants, because the case is brought by investors, not consumers. They contend that the RICO count is defective because the plaintiffs failed to plead the elements of an enterprise or continuity of operations. And the defendants all argue that the remaining counts fail to state claims. In addition, the Allen defendants contend that the complaint does not state any facts that would subject them to liability.

## II.

The defendants also contend that paragraphs 59 through 62 of the complaint should be stricken because the allegations of the defendants' involvement with Hezbollah have no relation to the claims, and are included to harass and embarrass the defendants. Those paragraphs allege that certain defendants support Hezbollah and openly attack Jewish people and that the defendants have laundered the plaintiffs' money to support terrorist activities carried out by Hezbollah. Federal Rule of Civil Procedure 12(f) states that "[t]he court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed.R.Civ.P. 12(f). The word "scandalous" in Rule 12(f) "generally refers to any allegation that unnecessarily reflects on the moral character of an individual or states anything in repulsive language that detracts from the dignity of the court." *Pigford v. Veneman*, 215 F.R.D. 2, 4 (D.D.C.2003) (internal citation omitted). " 'Immaterial' matter is that which has no essential or important relationship to the claim for relief or the defenses being pleaded.' " *Barnes v. Convention & Show Servs., Inc.*, 12–CV–13770, 2013 WL 2467920, at *1 (E.D.Mich. June 7, 2013) (quoting 5 Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1382, at 706–07 (1990)). " 'Impertinent' matter consists of statements that do not pertain, and are not necessary, to the issues in question." *Ibid.* (quoting Wright & Miller at 711).

There are several reasons for granting a motion to strike. One is where the complaint contains immaterial allegations that have no bearing on the subject matter of the litigation. *Reeves v. Wallington*, 06–10326, 2008 WL 5060400, at *3 (E.D.Mich. Nov. 24, 2008) (citing *Morse v. Weingarten*, 777 F.Supp. 312, 319 (S.D.N.Y.1991)). Another is when striking the pleading "aids in eliminating spurious issues before trial, thereby streamlining the litigation." *U.S.S.E.C. v. Thorn*, 2:01–CV–290, 2002 WL 31412440, at *2 (S.D.Ohio Sept. 30, 2002). For instance, in *Johnson v. County of Macomb*, 08–10108, 2008 WL 2064968 (E.D.Mich. May 13, 2008), the court struck paragraphs from the plaintiffs' complaint that the president of the Parks Commission was related to a person with "known ties to organized crime" because the allegations had no relationship to the plaintiffs' claims alleging violations of their civil rights and religious freedoms. The court noted that none of those claims turned on whether or not the president of the Parks Commission was related to someone with ties to organized crime.

The plaintiffs allege that the defendants may have laundered to Hezbollah the money that they took from the plaintiffs. The plaintiffs have offered nothing to substantiate those conclusory allegations, or tried to link them to the fraud scheme alleged. Even if the allegations are true, they are immaterial and impertinent to the plaintiffs' claims. They have no relationship to the allegations of fraud; nor do the RICO claims allege that the defendants laundered money to Hezbollah. Those claims allege that the defendants mailed and wired fraudulent purchase agreements, loan applications, verifications of deposit, lease agreements, and statements of income to the plaintiffs. Nor does any other claim for relief depend on the plaintiffs' allegations that the defendants are connected to Hezbollah. The allegations apparently were included to inflame a factfinder, without contributing to the conventional claims the plaintiffs try to raise. The Court will strike paragraphs 59 through 62 and the associated exhibit references.

## III.

The remaining parts of the motion are based on Federal Rule of Civil Procedure 12(b)(6). "The purpose of Rule 12(b)(6) is to allow a defendant to test whether, as a matter of law, the plaintiff is entitled to legal relief if all the facts and allegations in the complaint are taken as true." *Rippy ex rel. Rippy v. Hattaway*, 270 F.3d 416, 419 (6th Cir.2001) (citing *Mayer v. Mylod*, 988 F.2d 635, 638 (6th Cir.1993)). Under Rule 12(b)(6), the complaint is viewed in the light most favorable to the plaintiffs, the allegations in the complaint are accepted as true, and all reasonable inferences are drawn in favor of the plaintiffs. *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir.2008). "[A] judge may not grant a Rule 12(b)(6) motion based on disbelief of a complaint's factual allegations." *Saglioccolo v. Eagle Ins. Co.*, 112 F.3d 226, 228–29 (6th Cir.1997) (quoting *Columbia Nat'l Res., Inc. v. Tatum*, 58 F.3d 1101, 1109 (6th Cir.1995)). "However, while liberal, this standard of review does require more than the bare assertion of legal conclusions." *Tatum*, 58 F.3d at 1109; *Tackett v. M & G Polymers, USA, L.L.C.*, 561 F.3d 478, 488 (6th Cir.2009).

> To survive a motion to dismiss, [a plaintiff] must plead "enough factual matter" that, when taken as true, "state[s] a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). Plausibility requires showing more than the "sheer possibility" of relief but less than a "probab[le]" entitlement to relief. *Ashcroft v. Iqbal*, [556 U.S. 662, 678], 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009).

*Fabian v. Fulmer Helmets, Inc.*, 628 F.3d 278, 280 (6th Cir.2010). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Iqbal*, 556 U.S. at 678, 129 S.Ct. 1937 (quoting *Twombly*, 550 U.S. at 557, 127 S.Ct. 1955).

Under the new regime ushered in by *Twombly* and *Iqbal*, pleaded facts must be accepted by reviewing courts but conclusions may not be unless they are plausibly supported by the pleaded facts. "[B]are assertions," such as those that "amount to nothing more than a 'formulaic recitation of the elements'" of a claim, can provide context to the factual allegations, but are insufficient to state a claim for relief and must be disregarded. *Iqbal*, 556 U.S. at 681, 129 S.Ct. 1937 (quoting *Twombly*, 550 U.S. at 555, 127 S.Ct. 1955). However, as long as a court can "'draw the reasonable inference that the defendant is liable for the misconduct alleged,' a plaintiff's claims must survive a motion to dismiss." *Fabi-*

*an,* 628 F.3d at 281 (quoting *Iqbal,* 556 U.S. at 678, 129 S.Ct. 1937).

### A. Economic loss doctrine

 The four groups of defendants each argue that the plaintiffs' tort claims—counts I (fraudulent misrepresentation), II (fraud in the inducement), IX (common law conversion), X (statutory conversion), XI (unlawful trade practices and Michigan Consumer Protection Act), and XII (Civil Racketeering/RICO)—should be dismissed under Michigan's economic loss doctrine. The economic-loss doctrine is a "judicially created doctrine" that prohibits a party to a contract from bringing tort claims that are factually indistinguishable from breach of contract claims. *Detroit Edison Co. v. NABCO, Inc.,* 35 F.3d 236, 240 (6th Cir. 1994). The rule traces its origin to *Hart v. Ludwig,* 347 Mich. 559, 567, 79 N.W.2d 895 (1956), which held that a plaintiff may not prevail on any claim for tort liability where the relationship of the parties is entirely governed by a contract between them.

 The doctrine draws a line between breach of contract claims arising from commercial transactions, where commercial and contract law protect the parties' economic expectations, and tort actions intended to remedy unanticipated injuries as a result of conduct that violates a separate legal duty apart from the contract. *Neibarger v. Universal Cooperatives, Inc.,* 439 Mich. 512, 521, 486 N.W.2d 612, 615 (1992). The Michigan Court of Appeals has held that "[t]he distinction is critical" to avoid the "danger that tort remedies could simply engulf the contractual remedies and thereby undermine the reliability of commercial transactions." *Huron Tool & Eng'g Co. v. Precision Consulting Servs., Inc.,* 209 Mich.App. 365, 370–71, 532 N.W.2d 541, 544 (1995). The doctrine is animated by the idea that tort remedies should not bail out parties who could have anticipated losses caused by failed performance and negotiated an appropriate response. *Detroit Edison Co.,* 35 F.3d at 240, (stating that "[r]ational economic actors bargaining at arms length, in deciding both the extent of the seller's liabilities and the purchase price, should consider the possibility that the product will not perform properly: the buyer may insist on additional warranties to cover such a contingency, or the buyer may decide to assume a greater degree of the risk of such failure in exchange for a lower purchase price from the seller").

 However, Michigan courts have recognized an exception to the economic loss doctrine for the intentional tort of fraud in the inducement. "Fraud in the inducement ... addresses a situation where the claim is that one party was tricked into contracting. It is based on pre-contractual conduct which is, under the law, a recognized tort." *Huron Tool & Eng'g Co.,* 209 Mich.App. at 371, 532 N.W.2d at 544 (citing *Williams Electric Co. Inc. v. Honeywell, Inc.,* 772 F.Supp. 1225, 1237–1238 (N.D.Fla.1991)). "Fraud in the inducement presents a special situation where parties to a contract appear to negotiate freely—which normally would constitute grounds for invoking the economic loss doctrine—but where in fact the ability of one party to negotiate fair terms and make an informed decision is undermined by the other party's fraudulent behavior." *Id.* at 372, 532 N.W.2d at 546. The essence of the claim here is that the efforts to conceal the true condition of the houses sold "interfered with the conventional market forces in a manner that is beyond the power of the law of contracts to protect." *Tramontana v. May,* No. 02–10012, 2004 WL 539065, at *12 (E.D.Mich. Mar. 16, 2004).

 To establish fraud in the inducement, a party must show that " '(1) the

defendant made a material representation; (2) the representation was false; (3) when the defendant made the representation, the defendant knew that it was false, or made it recklessly, without knowledge of its truth and as a positive assertion; (4) the defendant made the representation with the intention that the plaintiff would act upon it; (5) the plaintiff acted in reliance upon it; and (6) the plaintiff suffered damage.'" *Custom Data Solutions, Inc. v. Preferred Capital, Inc.*, 274 Mich.App. 239, 242–43, 733 N.W.2d 102, 104–05 (2006) (quoting *Belle Isle Grill Corp. v. Detroit*, 256 Mich.App. 463, 477, 666 N.W.2d 271 (2003)). This tort addresses the bait-and-switch scenario, which the plaintiffs have laid out in their complaint. That is an important aspect of the allegations in the tort counts, because if the alleged fraud only concerns the "quality and characteristics" of the goods sold, the exception to the economic loss doctrine will not apply. *Huron Tool*, 209 Mich.App. at 374, 532 N.W.2d at 546.

Here, the defendants contend that the plaintiffs' tort claims do not fall within the fraudulent inducement exception because the alleged fraud is not "extraneous to the contract." That is one way to read the complaint, but not the only way. The plaintiffs allege that the defendants marketed the homes primarily to foreign investors who were unable or unlikely to view the properties prior to purchase. Compl. ¶ 37. On the few occasions that foreign investors visited Detroit, the defendants showed the investors, including the plaintiffs, properties that had been refurbished, but were not actually the properties for sale. *Ibid.* The plaintiffs also allege that the defendants mailed the plaintiffs fraudulent photos of the insides of homes that were different than the homes for sale. *Ibid.* Additionally, the plaintiffs allege that the defendants supplied forged lease documents to prospective buyers, lied to prospective buyers about the conditions of properties, and supplied false information regarding rental payments and amounts. Compl. ¶ 41. These allegations of "pre-contractual" misconduct is a "recognized" tort under the law. *Huron Tool*, 209 Mich.App. at 371, 532 N.W.2d at 544.

Additionally, the complaint sets forth sufficient facts to support each element of a fraud in the inducement claim. The complaint alleges that the defendants made multiple material representations to the plaintiffs to induce them to purchase the Detroit properties, *i.e.*, that the properties were currently tenanted, the tenants were paying a specific amount of monthly rent on executed, valid leases, the homes were Section 8 approved, the properties were newly and fully refurbished, and the properties would generate a specific amount of income and percentage rate of return on initial investment. Compl. ¶ 248. The complaint also alleges that these representations were false: the properties were either not leased or the tenant was paying a significantly lower amount of rent than represented to the plaintiffs, *ibid.*; the properties were not refurbished, Section 8 approved, or generating the monthly income and percentage of return fraudulently represented by the defendants, *id.* ¶ 249. The complaint also alleges that the defendant knew that the representations were false and made the representations to further their fraudulent scheme with the intention that the plaintiffs would act upon them. *Id.* ¶ 251–53. The plaintiffs allege that they acted upon the defendants' representations: they purchased the homes marketed to them and paid for repairs, evictions, and management fees. *Id.* ¶ 254. Absent these false statements, the plaintiffs say they would never have purchased the properties. *Id.* ¶ 255. Finally, the plaintiffs allege that the fraudulent misrep-

resentations resulted in economic damages in excess of $100,000 per property. *Id.* ¶ 257.

■ "Fraudulent inducement involves a general duty to avoid wrongful conduct that induces a party to enter into a contract." *Onyx Envtl. Servs., LLC v. Maison,* 407 F.Supp.2d 874, 880 (N.D.Ohio 2005) (citing *Mesaros v. FirstEnergy Corp.,* 2005 WL 2460739, at *8 (N.D.Ohio, Oct. 5, 2005)). The plaintiffs have pleaded a breach of that duty, and therefore have pleaded successfully around the economic loss doctrine.

### B. Sufficiency of fraud allegations

■ The four groups of defendants also argue that the counts of the complaint alleging fraud are not specific enough to meet the requirements of Federal Rule of Civil Procedure 9(b). When alleging fraud in a federal complaint, a party must state "with particularity" the circumstances constituting the fraud. Fed.R.Civ.P. 9(b); *see also Bennett v. MIS Corp.,* 607 F.3d 1076, 1100 (6th Cir.2010). That means that the complaint must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Indiana State Dist. Council of Laborers and Hod Carriers Pension and Welfare Fund v. Omnicare, Inc.,* 583 F.3d 935, 942–43 (6th Cir.2009) (quotation marks and citation omitted). In addition, a party must identify the "alleged misrepresentation on which he or she relied; the fraudulent scheme; the fraudulent intent of [the other party]; and the injury resulting from the fraud." *Coffey v. Foamex L.P.,* 2 F.3d 157, 161–62 (6th Cir.1993) (quotation marks and citations omitted).

### 1. Group pleading

■ The defendants argue that the allegations of fraud are insufficient because the complaint does not identify with specificity the parties making the fraudulent statements. The defendants' contention is well-taken. The complaint is rife with undifferentiated references to the "Defendants," and the "Ponzi Scheme Defendants." It is difficult to parse the allegations against each individual defendant because in many instances the complaint groups all of the defendants together.

■ Under *Hoover v. Langston Equipment Associates, Inc.,* 958 F.2d 742, 745 (6th Cir.1992), a plaintiff must specify which of the defendants made each fraudulent statement and may not bring claims of fraud against "the defendants" generally. Collective references to "the defendants" or other such categories by themselves fail the specificity test of Rule 9(b). *See D.E. & J Ltd. Partnership v. Conaway,* 284 F.Supp.2d 719, 730 (E.D.Mich.2003) (observing that "[n]ot only does such 'group pleading' run afoul of *Central Bank [v. First Interstate Bank of Denver, N.A.,* 511 U.S. 164, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994) ], but also it fails to meet … Fed. R.Civ.P. 9(b)'s specificity requirements …." (citing cases)). Rule 9(b) does not permit a plaintiff to allege fraud by "indiscriminately grouping all of the individual defendants into one wrongdoing monolith." *United States, ex rel. Branhan v. Mercy Health Sys. of SW. Ohio,* 188 F.3d 510 (6th Cir.1999) (Clay, J., concurring in part and dissenting in part) (quoting *Lubin v. Sybedon Corp.,* 688 F.Supp. 1425, 1443 (S.D.Cal.1988)).

■ But "[w]hen faced with a motion to dismiss for failure to plead fraud 'with particularity' as required by Rule 9(b) …, 'a court must factor in the policy of simplicity in pleading which the drafters of the Federal Rules codified in Rule 8.'" *Whalen v. Stryker, Corp.,* 783 F.Supp.2d

977, 982 (E.D.Ky.2011) (quoting *Michaels Building Co. v. Ameritrust Co., N.A.,* 848 F.2d 674, 679 (6th Cir.1988)). "Rule 9(b) is not to be read in isolation, but is to be interpreted in conjunction with Federal Rule of Civil Procedure 8." *United States ex rel. Bledsoe v. Community Health Systems, Inc.,* 501 F.3d 493, 503 (6th Cir.2007) (quoting *Michaels,* 848 F.2d at 679). "When read against the backdrop of Rule 8, it is clear that the purpose of Rule 9 is not to reintroduce formalities to pleading, but is instead to provide defendants with a more specific form of notice as to the particulars of their alleged misconduct." *Ibid.* "The threshold test is whether the complaint places the defendant on sufficient notice of the misrepresentation allowing the defendants to answer, addressing in an informed way plaintiff[']s claim of fraud." *Coffey v. Foamex L.P.,* 2 F.3d 157, 162 (6th Cir.1993) (quotation marks omitted).

In their 116–page complaint, the plaintiffs exhaustively detail allegations of a scheme to defraud that involved the officers and employees of Metro Property Group, LLC, Metro Property Management, LLC, Global Power Equities, LLC and Apex Equities, LLC. The complaint describes how the plaintiffs discovered the purported scheme and each defendants' alleged role. For instance, the plaintiffs allege that Sameer Beydoun, Ali Beydoun, David Makki, and Kathy Messics supplied fraudulent, forged lease documents for non-existent tenants to prospective buyers and current homeowners; defendants Sameer Beydoun, Kathy Messics, and George Vanderburg forged the leases; defendants Sameer Beydoun, Ali Beydoun, David Makki, and Kathy Messics lied to prospective buyers and homeowners about the conditions of properties; and defendant Chris Picciurro routinely supplied false information regarding rental payments and amounts. Compl. ¶ 41. Additionally, the plaintiffs allege that Tarek Baydoun covered up the fraud by billing several plaintiffs for legal work such as fraudulent evictions of non-existent tenants. ¶ 53. The complaint also describes in detail the relationship between the corporate defendants and individual defendants. ¶ 44. The plaintiffs support these general allegations of fraud through specific examples of how each defendant attempted to conceal the fraud after the plaintiffs suspected that they had been tricked into purchasing virtually worthless homes. ¶¶ 63–246. The plaintiffs also attach marketing materials, emails, and management agreements detailing communications between the plaintiffs and various defendants. ¶¶ 63–246. These allegations provide a general framework for relevant discovery and are sufficient to alert the defendants " 'as to the particulars of their alleged misconduct' " so that they may respond to the complaint. *Chesbrough v. VPA, P.C.,* 655 F.3d 461, 466 (6th Cir.2011) (quoting *U.S. ex rel. SNAPP, Inc. v. Ford Motor Co.,* 532 F.3d 496, 504 (6th Cir.2008)). As the Court noted in *Brown v. Bank of New York Mellon,* 1:10–CV–550, 2011 WL 206124, at *4 (W.D.Mich. Jan. 21, 2011): "It is the degree of particularity in [the plaintiffs'] complaint, rather than the lack of particularity, that makes [plaintiffs'] complaint difficult to sift through."

The complaint alleges that Metro Property Group and Sameer Beydoun created information sheets that falsely represented to the plaintiffs that the properties they purchased were currently tenanted, the tenants were paying a specific amount of monthly rent pursuant to executed valid leases, the homes were Section 8 approved, the properties were newly and fully refurbished, and the properties would generate a specific amount of income and percentage rate of return on initial investment. Compl. ¶ 248. The plaintiffs allege that

these representations were false, the defendants knew they were false, and the plaintiffs relied on these misrepresentations when they purchased the properties. ¶¶ 259–267. The allegations concerning Metro Property Group and Sameer Beydoun are sufficient to state claims for fraud.

 It is a closer call as to the remaining defendants. The plaintiffs allege that Metro Property Management, LLC, Global Power Equities, LLC, Apex Equities, LLC, Ali Beydoun, Mike Alaweih, David Makki, Chris Picciurro, Kathy Messics, George Vanderburg, and Tarek M. Baydoun marketed the homes to the plaintiffs using the property information sheets that Sameer Baydoun and Metro Property Group created, informed the plaintiffs that the properties were either already occupied or Section 8 approved and occupied, and the plaintiffs relied on this information when they purchased the homes. ¶¶ 90, 91, 110, 111, 132, 133, 154, 155, 173, 174. These allegations do not specify what each defendant said or their role in marketing the homes. But another section of the complaint alleges that Sameer Beydoun, Ali Beydoun, David Makki, and Mike Alaweih induced the plaintiffs into purchasing the homes with promises that the homes were habitable, tenanted, turnkey properties that met Section 8 requirements. ¶ 45.

The most detailed allegations involve statements that these defendants made *after* the plaintiffs discovered that the homes fell far short of what was marketed to them. The defendants contend that those allegations of post-sale misconduct, at most, suggest that these defendants misrepresented facts to conceal a prior fraud, not to induce the plaintiffs to purchase the homes. That may be true, but it also suggests that the defendants may have played a role in conspiring to commit fraud. The allegations in the complaint that those defendants fraudulently marketed the homes to the plaintiffs states enough factual matter that, when taken as true, "state[s] a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 556, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007).

 Nonetheless, the complaint is wanting of allegations as to certain other defendants. One of them is Tarek Baydoun. The complaint contains four allegations against Tarek Baydoun: (1) Baydoun participated in marketing the homes to potential buyers, Compl. ¶ 40; (2) Baydoun billed several plaintiffs for fraudulent evictions to cover up the defendants' fraudulent actions, *id.* at ¶ 53; (3) Baydoun threatened the plaintiffs with criminal prosecution and ignored their email messages when they asked him questions about the fraudulent evictions, *ibid.;* and (4) Baydoun supports Hezbollah, *id.* at ¶ 59.

The allegations that Baydoun participated in marketing the homes to potential buyers is insufficient to state a claim for fraud for at least three reasons. *First,* the allegations are insufficient to demonstrate that Baydoun made any representations: the complaint only alleges that Baydoun "appears on videos," "laughing it up." Compl. ¶ 40. *Second,* although the complaint alleges that Baydoun participated in the fraudulent marketing scheme, the plaintiffs do not allege that Baydoun marketed the homes to the plaintiffs in this case or that the plaintiffs viewed the videos; therefore, the plaintiffs could not have relied on anything Baydoun might have said. *Third,* the allegations are insufficient under Rule 9(b) because the plaintiffs have not alleged which plaintiffs, if any, viewed the videos, when, or where.

■ The allegations that Baydoun billed several plaintiffs for fraudulent evictions is insufficient to state a claim for fraud because the plaintiffs have not established how the plaintiffs relied on that conduct when deciding to make their purchases. The plaintiffs imply in their response brief that they relied upon these evictions and other post-sale fraud to purchase additional homes. But they do not point to any portion of the complaint that actually says that.

■ Likewise, the allegations that Tarek Baydoun threatened the plaintiffs with criminal prosecution and ignored their email messages does not state a claim for fraud because the plaintiffs have not explained how this statement is false or how the plaintiffs relied on the representation to their detriment. Failing to return emails does not state a claim for fraud because not speaking cannot constitute a representation.

The allegation that Tarek Baydoun supports Hezbollah is unrelated to any of the plaintiffs' causes of action and will be struck from the complaint.

The complaint fails to state a fraud claim against defendant Tarek Baydoun, and therefore counts I and II will be dismissed as to him.

■ The allegations against the Allen defendants are even more anemic. Those allegations consist of claims that (1) Tarek Baydoun was "Of Counsel" to the Allen Brothers, PLLC; (2) the Allen Brothers should have been aware that their "Of Counsel" attorney, Tarek Baydoun, was engaged in illegal and fraudulent behavior; (3) James Allen sent threatening messages to the plaintiffs and attempted to cover up the "Ponzi Scheme fraud;" (4) James Allen, John Allen, and Allen Brothers, PLLC attempted to conceal defendant Tarek Baydoun's continuing relationship with them by removing his name from the Allen Brothers, PLLC's website; (5) Tarek Baydoun nevertheless continued to use the law firm's resources; and (6) James Allen acted in concert with Tarek Baydoun in the "conspiracy" and to further the "Ponzi scheme fraud." Compl. ¶¶ 52–56.

These allegations are conclusory and therefore do not satisfy Rule 9(b) on any of the fraud allegations, and they do not implicate any of the Allen defendants in any of the alleged wrongdoing of the other defendants. The Allen defendants' "of counsel" relationship with Tarek Baydoun furnishes no basis for liability because the plaintiffs have not stated a fraud claim against Baydoun. Removing Baydoun's name from the Allen defendants' website fails to state a claim for fraud because that conduct cannot amount to a representation. Even if it could be considered such, the plaintiffs do not allege that they relied on it when deciding to purchase any of the properties. The allegation that James Allen sent threatening messages to the plaintiffs, acted in concert with Tarek Baydoun, and attempted to cover up the "Ponzi Scheme fraud" do not satisfy Rule 9(b) because the plaintiffs failed to allege the time, place, and content of the alleged representations. The complaint contains no detail as to what James Allen said; to whom; the medium through which the threats were communicated; or whether the plaintiffs relied on the threatening messages when they purchased the properties. *Chesbrough v. VPA, P.C.*, 655 F.3d 461, 467 (6th Cir.2011) (quoting *Bledsoe*, 501 F.3d at 504). These allegations are insufficient under Rule 9(b).

The complaint does not allege plausibly any other wrongdoing by the Allen defendants, and they were not parties to any of the contracts. Therefore, their motion to dismiss the complaint will be granted as to them.

## 2. Reliance

Under Michigan law, to state a claim of fraud the plaintiffs must plead " '(1) [t]hat defendant made a material representation; (2) that it was false; (3) that when he made it he knew that it was false, or made it recklessly, without any knowledge of its truth, and as a positive assertion; (4) that he made it with the intention that it should be acted upon by plaintiff; (5) that plaintiff acted in reliance upon it; and (6) that he thereby suffered injury.' " *Hi–Way Motor Co. v. Int'l Harvester Co.*, 398 Mich. 330, 336, 247 N.W.2d 813, 815–16 (1976) (quoting *Candler v. Heigho*, 208 Mich. 115, 121, 175 N.W. 141, 143 (1919)). The absence of any one of these elements " 'is fatal to a recovery.' " *Ibid.*

The defendants argue that the plaintiffs cannot plausibly allege the element of reasonable reliance because the contract contains a merger clause and declares that the properties were sold in "As Is Condition." They rely on the notion that "[a] misrepresentation claim requires *reasonable* reliance on a false representation." *Nieves v. Bell Indus., Inc.*, 204 Mich.App. 459, 464, 517 N.W.2d 235, 238 (1994) (emphasis added), and they contend that the contract language precludes the possibility that the plaintiffs could have relied on pre-sale representations with any degree of reasonableness. The purchase agreements each state:

> 10. **Condition of Premises.** All properties will be sold in As Is Condition.
>
> . . . .
>
> 12. **Binding nature and final agreement.** This Agreement shall be binding on and inure to the benefit of the parties and their respective heirs, personal representatives and assigns. This Agreement sets forth the entire agreement between the parties and may not be amended, modified, altered or changed except in writing signed by the parties. [proper cite] Dkt. # 35–2 at 2.

There is some support for the idea that a merger and integration clause renders reliance on pre-contract representations unreasonable *per se*. In *Watkins & Son Pet Supplies v. Iams Co.*, 254 F.3d 607, 612 (6th Cir.2001), the court read Ohio law to hold that "[i]f a written contract is completely integrated, it is unreasonable as a matter of law to rely on parol representations or promises within the scope of the contract made prior to its execution." But Michigan courts do not take the point so far. For instance, in *Archambo v. Lawyers Title Ins. Corp.*, 466 Mich. 402, 646 N.W.2d 170 (2002), the Michigan Supreme Count held that although "an integration clause nullifies all antecedent agreements," that rule is "[s]ubject ... to evidence of certain kinds of fraud (or other grounds sufficient to set aside a contract) and for the rare situation when the written document is obviously incomplete on its face." *Id.* at 413, 414 n. 15, 646 N.W.2d at 177 & n. 15 (internal quotations and citations omitted); *see also UAW–GM Human Resource Center v. KSL Recreation Corp.*, 228 Mich.App. 486, 503, 579 N.W.2d 411, 419 (1998) (holding that "the only fraud that could vitiate the contract is fraud that would invalidate the merger clause itself, i.e., fraud relating to the merger clause or fraud that invalidates the entire contract including the merger clause" (quoting 3 Corbin, Contracts, § 578)).

This case, then, is governed by the rule that the presence of a merger clause in a written contract will not preclude a claim for fraud in the inducement where the plaintiff can show that it would have avoided the agreement entirely had it known that the defendant's fraudulent representations in fact were false. *Custom Data Solutions, Inc. v. Preferred Capital,*

*Inc.*, 274 Mich.App. 239, 243, 733 N.W.2d 102, 105 (2006) (observing that "[d]espite the existence of a merger clause, parol evidence is admissible for purposes of demonstrating that the agreement is void or voidable or for proving an action for deceit. *Fraus omnia corrumpit:* fraud vitiates everything it touches" (quoting Calamari & Perillo, The Law of Contracts § 9.21, at 340–41 (4th ed.))). As the Sixth Circuit has explained:

> [T]here is an important distinction between (a) representations of fact made by one party to another to induce that party to enter into a contract, and (b) collateral agreements or understandings between two parties that are not expressed in a written contract. It is only the latter that are eviscerated by a merger clause, even if such were the product of misrepresentation. It stretches the [*KSL Recreation* ] holding too far to say that any pre-contractual factual misrepresentations made by a party to a contract are wiped away by simply including a merger clause in the final contract.

*LIAC, Inc. v. Founders Ins. Co.*, 222 Fed. Appx. 488, 493 (6th Cir.2007) (quoting *Star Ins. Co. v. United Commercial Ins. Agency, Inc.*, 392 F.Supp.2d 927, 929–30 (E.D.Mich.2005)) (alterations in original).

In this case, the plaintiffs contend that the defendants' misrepresentations induced them to enter into the purchase agreements for the Detroit properties. The plaintiffs' allegations that they would not have entered into those agreements but for the misrepresentations about the properties, if true, would invalidate the entire contract, including the merger clauses. The merger clause and clause that renders the properties sold in "As in Condition" therefore do not render the plaintiffs' reliance on prior representations unreasonable as a matter of law.

### 3. Promise of future performance

The defendants also argue that the allegations of future promises do not satisfy the material misrepresentation element of a common law fraud claim. Michigan law does in fact require that actionable misrepresentations must relate to an existing or past fact; promises relating to future actions when unfulfilled do not constitute fraud. *Hi–Way Motor Co.*, 398 Mich. at 336, 247 N.W.2d at 815–16. However, Michigan courts recognize exceptions. For instance, "one can be held liable for broken promises when one has, at the time of the promise, a then-existing bad faith intent to break the promise." *Thompson v. Paasche*, 950 F.2d 306, 312 (6th Cir. 1991) (applying Michigan law). This "false token" exception applies when "the facts of the case compel the inference that the promise was but a devise to perpetrate a fraud" and the promise was made "without intention of performance." *Hi–Way Motor Co.*, 398 Mich. at 339, 247 N.W.2d at 817; *see also Rutan v. Straehly*, 289 Mich. 341, 286 N.W. 639 (1939). Michigan courts also recognize that actionable fraudulent inducement can occur when "a party materially misrepresents future conduct under circumstances in which the assertions may reasonably be expected to be relied upon and are relied upon." *Samuel D. Begola Servs., Inc. v. Wild Bros.*, 210 Mich.App. 636, 639, 534 N.W.2d 217, 219 (1995). A party induced by fraud to enter into a contract may elect to void the contract. *Id.* at 640, 534 N.W.2d at 217.

The complaint alleges that the defendants told the plaintiffs that the properties would provide specific gross yearly income and a specific yearly rate of return. *See, e.g.,* Compl. ¶ 64. The complaint also alleges that the defendants knew that those representations of specific gross yearly income and annual rate of return were false, made the representations with the intent

that the plaintiffs would rely upon them, and that the plaintiffs did in fact rely on the representations when deciding whether to purchase the properties. ¶¶ 264–66. Moreover, the complaint provides extensive factual allegations that the defendants intended to perpetuate a fraud. For instance, the complaint alleges that, after discovering the fraud, the defendants lied to the plaintiffs about whether the houses were occupied, provided forged leases, and told the plaintiffs that tenants had stopped paying rent in order to cover up the purported fraud. ¶¶ 63–246. The complaint provides sufficient allegations that the defendants "materially misrepresent[ed] future conduct under circumstances in which the assertions [would] reasonably be expected to be relied upon and [were] relied upon." *Samuel D. Begola Servs.*, 210 Mich.App. at 639, 534 N.W.2d at 219. The plaintiffs allegations of fraud based upon future promises states a claim for relief under Michigan law.

### C. Count III: Breach of contract

■ The defendants argue that the "As Is" and merger clauses bar the plaintiffs' breach of contract claims. The plaintiffs allege that the defendants offered to sell and the plaintiffs agreed to purchase refurbished, tenanted, guaranteed income generating, Section–8 approved properties. Compl. ¶ 280. But the defendants point out that the purchase agreements do not contain warranties regarding renovation, tenancy, or anticipated income. The only clause that relates to the condition of the houses states that the properties would be sold in "As Is Condition."

■ The law is quite clear that the parties' intent must govern a breach of contract claim, and the Court must ascertain the intent of the parties by examining the contract language. *Sheldon–Seatz, Inc. v. Coles*, 319 Mich. 401, 406–407, 29 N.W.2d 832 (1947). The Court "does not

have the right to make a different contract for the parties or to look to extrinsic testimony to determine their intent when the words used by them are clear and unambiguous and have a definite meaning." *Ibid.* "Even though extrinsic evidence of contemporaneous or prior negotiations is admissible to show the parties did not intend the written agreement to be final and complete, an integration clause in a written contract conclusively establishes that the parties intended the written contract to be the complete expression of their agreement." *Wonderland Shopping Ctr. Venture Ltd. P'ship v. CDC Mortgage Capital, Inc.*, 274 F.3d 1085, 1095 (6th Cir.2001). Parol evidence is inadmissible to contradict or vary the terms of a contract with a merger clause. *UAW–GM Human Resource Center*, 228 Mich.App. at 499, 579 N.W.2d at 417.

The plaintiffs' allegations that the defendants promised to refurbish the homes, and guaranteed tenancy and specific income are inadmissible to alter the terms of the contract. *Id.* at 492, 579 N.W.2d at 414 ("[p]arol evidence of contract negotiations, or of prior or contemporaneous agreements that contradict or vary the written contract, is not admissible to vary the terms of a contract which is clear and unambiguous."). At oral argument, counsel for the plaintiffs cited *Star Insurance Company v. United Commercial Insurance Agency, Inc.*, 392 F.Supp.2d 927 (E.D.Mich.2005) and *UAW–GM Human Resource Center* for the proposition that allegations of fraud are admissible to alter the terms of a contract with a merger clause. The plaintiffs have mis-stated the holdings in these cases. As noted above, in *UAW–GM Human Resource Center*, the Michigan Court of Appeals held that a merger clause could be vitiated based on evidence of fraud "relating to the merger clause or fraud that invalidates the entire

contract including the merger clause." 228 Mich.App. 486, 498, 579 N.W.2d 411, 417 (1998). The plaintiffs have not alleged fraud in the merger clause itself. Instead, the plaintiffs allege that the defendants fraudulently induced them to buy investment properties in Detroit. The plaintiffs' allegations of fraud in the inducement do not save their breach of contract claim because the remedy for fraud in the inducement is to void the contract, not reform it. *See UAW–GM*, 228 Mich.App. at 503, 579 N.W.2d at 418 ("Fraud ... makes a contract voidable at the instance of the innocent party.") (quoting 3 Corbin, Contracts, § 580, p. 431); *Star Ins. Co.*, 392 F.Supp.2d at 929 (holding that fraudulent inducement renders a contract void or voidable). The plaintiffs' argument conflates their tort and contract causes of action by asserting that the plaintiffs' contract should be reformed with the alleged fraudulent terms. They are incorrect.

*Star Insurance Company* does not support the plaintiffs' contention, either. In that case, the court recognized that a plaintiff may bring a separate and distinct cause of action for fraud in the inducement despite the existence of a merger clause. The court did not hold that proof of fraud would allow contract reformation. Although the plaintiffs' cause of action for fraud in the inducement may survive the parties' merger clause, their breach of contract claim does not.

But the allegations in the breach of contract count are somewhat obscure. The plaintiffs allege that they "purchased properties *and* management services" from the defendants, as if there were a single agreement. Compl. ¶ 271. It appears, however, that the agreement to manage the rental properties was separate from the purchase-and-sale contract, and established a distinct obligation to manage and maintain the properties. The complaint alleges that those services were not performed; the "As Is" and merger clauses have nothing to do with that obligation. That claim may proceed, but only as to the signatories to the management contracts.

 The parties to all of the management agreements are the plaintiff signatory and Metro Property Management. It is true that some of the individual defendants signed the contracts on behalf of the corporate defendants. However, "[u]nless otherwise agreed, a person making or purporting to make a contract with another as agent for a disclosed principal does not become a party to the contract." *Riddle v. Lacey & Jones*, 135 Mich.App. 241, 246, 351 N.W.2d 916 (1984) (quoting 2 Restatement Agency, 2D, § 320, p 67). There is no indication in the purchase agreements that the individual defendants agreed to be held personally responsible for the contract terms and conditions.

The plaintiffs contend that the Court should not dismiss count III against the individual defendants because the complaint alleges an *alter ego* theory of liability. But, as explained below in more detail, the plaintiffs have not stated sufficient factual allegations to support that theory. The complaint does allege that Sameer Beydoun, Ali Beydoun, and David Makki "exercised dominion and control over" over the corporate defendants; commingled their identifies, finances, business practices, and policies; and the companies did not maintain a separate corporate existence from the individual defendants. Compl. ¶¶ 282, 284. But "[t]hese 'naked assertions devoid of further factual enhancement' contribute nothing to the sufficiency of the complaint." *Flagstar Bank, F.S.B.*, 727 F.3d at 506 (6th Cir.2013) (quoting *Iqbal*, 556 U.S. at 678, 129 S.Ct. 1937); *see also Bennett v. Am. Online, Inc.*, CIV. 06–13221, 2007 WL 2178317, at *15 (E.D.Mich. July 27, 2007) (dismissing

claim based on theory that AOL was merely an alter ego of Time Warner).

The breach of contract claim will be dismissed, except as to the claim that defendant Metro Property Management breached the various management agreements.

### D. Count IX (common law conversion) and X (statutory conversion)

█ The defendants argue that the plaintiffs cannot state claims for statutory or common law conversion because the plaintiffs' conversion claims are not separate and distinct from their breach of contract claims. The plaintiffs respond that conversion occurred when the defendants charged (and the plaintiffs paid) for repairs and evictions that never were performed.

█ Conversion arises from "any distinct act of domain wrongfully exerted over another's personal property in denial of or inconsistent with the rights therein." *Foremost Ins. Co. v. Allstate Ins. Co.*, 439 Mich. 378, 391, 486 N.W.2d 600 (1992); *see also Murray Hill Publ'ns, Inc. v. ABC Commc'ns, Inc.*, 264 F.3d 622, 636–37 (6th Cir.2001). There are two forms of statutory conversion:

(a) Another person's stealing or embezzling property or converting property to the other person's own use.

(b) Another person's buying, receiving, possessing, concealing, or aiding in the concealment of stolen, embezzled, or converted property when the person buying, receiving, possessing, concealing, or aiding in the concealment of stolen, embezzled, or converted property knew that the property was stolen, embezzled, or converted.

Mich. Comp. L. § 600.2919a. Under Michigan law, a plaintiff may sue "for the conversion of funds that were delivered to the defendant for a specified purpose, but that

the defendant diverted to his or her own use." *Tooling Mfg. & Technologies Ass'n v. Tyler*, No. 293987, 2010 WL 5383529, at *10 (Mich.App. Dec. 28, 2010) (citing *Hogue v. Wells*, 180 Mich. 19, 24, 146 N.W. 369 (1914); *Warren Tool Co. v. Stephenson*, 11 Mich.App. 274, 300, 161 N.W.2d 133 (1968)). "To support an action for conversion of money, the defendant must have an obligation to return the specific money entrusted by plaintiff to his care." *El Camino Res., Ltd. v. Huntington Nat. Bank*, 722 F.Supp.2d 875, 915 (W.D.Mich. 2010) (citing *Garras v. Bekiares*, 315 Mich. 141, 23 N.W.2d 239, 242 (1946)). "It is clear that when the dispute is over moneys owed, conversion is only applicable in cases involving money that is the property of one party but held by another party (e.g., bank accounts, trusts, etc.) which is then wrongfully taken." *Sudden Serv., Inc. v. Brockman Forklifts, Inc.*, 647 F.Supp.2d 811, 815–16 (E.D.Mich.2008) (citing *Trail Clinic, PC v. Bloch*, 114 Mich.App. 700, 319 N.W.2d 638 (1982)).

█ The defendants are correct that a conversion claim "cannot be brought where the property right alleged to have been converted arises entirely from the [plaintiff's] contractual rights." *James T. Scatuorchio Racing Stable, LLC v. Walmac Stud Mgmt., LLC*, 941 F.Supp.2d 807, 827 (E.D.Ky.2013) (citations omitted). However, "[a] conversion claim and contract claims are not always incompatible." *Davis v. Siemens Med. Solutions USA, Inc.*, 399 F.Supp.2d 785, 801 (W.D.Ky. 2005). "[I]t is possible for a party's conduct to result in both a breach of contract and a tort for common law conversion[,] so long as the defendant's conduct constituted a breach of duty separate and distinct from the breach of contract." *Devon Indus. Grp., LLC v. Demrex Indus. Servs., Inc.*, 11–10313, 2012 WL 4839013

(E.D.Mich. Oct. 11, 2012) (citations omitted).

The plaintiffs have not identified such a "separate duty." They allege only that, in an effort to conceal the fraudulent scheme, the defendants charged the plaintiffs for repairs that were never made and court fees and eviction costs even though no one lived at the properties. Compl. ¶¶ 39, 86, 104, 106, 127, 140–42, 145, 211, 241. That states no more than that the defendants did not live up to their property management obligations. If it were not for the parties' management agreement, the defendants would have had no legal obligation to make repairs or initiate legal proceedings. The gravamen of their complaint is that the defendants failed to manage the properties in conformity with the parties' contractual agreement and charged the plaintiffs for management services that were unnecessary or never completed. That does not state a cause of action for conversion.

### E. Count XI (Unlawful Trade Practices and Michigan Consumer Protection Act)

■ The defendants argue that the plaintiffs have failed to state a claim under the Michigan Unlawful Trade Practices Act because, by its express terms, the Act only applies to the sale of goods. Mich Comp. Laws § 445.101 ("AN ACT to define certain unlawful trade practices connected with the sale or other transfer; or with the purchase for another of goods, wares or merchandise. . . ."). They also contend that the Michigan Consumer Protection Act does not apply to the plaintiffs because they are investors and purchased the properties for business purposes, not as consumers. The plaintiffs argue that they can pursue a claim under the MCPA because they are not incorporated as businesses and they did not purchase the homes as businesses. The defendants have the better argument.

■ The thrust of the complaint is that the plaintiffs' investment in rental properties in Detroit resulted in a loss to them, either because the defendants misrepresented the condition of the properties and the likely rate of return or they breached their contracts. Under Michigan law, "if an item is purchased primarily for business or commercial rather than personal purposes, the MCPA does not supply protection." *Zine v. Chrysler Corp.*, 236 Mich.App. 261, 273, 600 N.W.2d 384, 393 (1999); *see also MacDonald v. Thomas M. Cooley Law Sch.*, 880 F.Supp.2d 785, 792 (W.D.Mich.2012). Moreover, the MCPA does not apply to investors. *Quartell v. Great Lakes Bancorp*, 183368, 1996 WL 33347624 (Mich.Ct.App. Dec. 17, 1996) (holding that the MCPA does not apply to property purchased for investment purposes).

The plaintiffs have failed to state a valid claim for relief in Count XI of the complaint, which will be dismissed.

### F. Count XII (RICO)

The plaintiffs allege in their complaint that the defendants all violated the Racketeer Influenced and Corrupt Organizations (RICO) Act by prosecuting their scheme to defraud individuals, including the plaintiffs, who purchased residential investment rental properties in Detroit. The defendants, in their combined arguments, contend that the RICO count is not pleaded adequately because the predicate acts of fraud are not stated with particularity, and the plaintiffs have not pleaded facts showing the existence of an "enterprise" separate from the pattern of illegal activity. They also argue that the "pattern" element is not pleaded adequately because there is no fact that shows a continuity of activity.

RICO's civil remedy provision states that "[a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee...." 18 U.S.C. § 1964(c). The plaintiffs allege violations of subsections 1962(c) and (d) against the defendants.

 Subsection 1962(c) makes it "unlawful for any person employed by or associated with any enterprise engaged in" activities affecting "interstate or foreign commerce ... to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c). To state a claim under subsection 1962(c), the plaintiff must plead "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985) (footnote omitted); *see also Moon v. Harrison Piping Supply*, 465 F.3d 719, 723 (6th Cir.2006). Similarly, subsection 1962(d) makes it "unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section." 18 U.S.C. § 1962(d). Under that provision, the plaintiff must "detail[ ] an agreement to jointly undertake specific actions illegalized by RICO," other elements of a conspiracy claim, and the underlying RICO violations. *Pik–Coal Co. v. Big Rivers Elec. Corp.*, 200 F.3d 884, 890 n. 10 (6th Cir.2000) (citing *Craighead v. E.F. Hutton & Co., Inc.*, 899 F.2d 485, 495 (6th Cir.1990)). RICO pleadings are to be liberally construed. *Begala v. PNC Bank*, 214 F.3d 776, 781 (6th Cir.2000). However, under Rules 8(a) and 12(b)(6), as presently interpreted, the court does not accept legal conclusions unsupported by the pleaded facts. *Lillard v. Shelby Cnty. Bd. of Educ.*, 76 F.3d 716, 726 (6th Cir.1996).

### 1. Allegations of fraud

 When the predicate acts are based on fraud, Federal Rule of Civil Procedure 9(b)'s heightened pleading requirement applies. *Brown v. Cassens Transp. Co.*, 546 F.3d 347, 356 n. 4 (6th Cir.2008). At a minimum, the complaint alleging a RICO claim must state "the nature of the fraud [that] gives rise to the predicate offense." *Blount Fin. Servs., Inc. v. Walter E. Heller & Co.*, 819 F.2d 151, 152 (6th Cir.1987). For the reasons discussed above, the Court is satisfied that the complaint states the allegations of fraud with sufficient particularity.

### 2. Enterprise

 RICO defines an "enterprise" as "any individual, partnership, corporation, association, or other legal entity and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4); *see also United States v. Turkette*, 452 U.S. 576, 583, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981) (defining an enterprise as a "group of persons associated together for a common purpose of engaging in a course of conduct"). To make out a claim under section 1962(c), the plaintiff must plead that "the 'enterprise' is the instrument through which illegal activity is conducted." *United States v. Chance*, 306 F.3d 356, 371–72 (6th Cir.2002) (citing *Nat'l Org. for Women, Inc. v. Scheidler*, 510 U.S. 249, 258, 114 S.Ct. 798, 127 L.Ed.2d 99 (1994)). To meet that requirement, the plaintiff must plead facts showing:

> (1) an ongoing organization with some sort of framework or superstructure for making and carrying out decisions; (2) that the members of the enterprise functioned as a continuing unit with estab-

lished duties; and (3) that the enterprise was separate and distinct from the pattern of racketeering activity in which it engaged.

*Ouwinga v. Benistar 419 Plan Servs., Inc.,* 694 F.3d 783, 794 (6th Cir.2012) (citing *Chance,* 306 F.3d at 372). Alternatively, the plaintiff may demonstrate the existence of an "association-in-fact enterprise." An association in fact includes "a group of persons associated together for a common purpose of engaging in a course of conduct." *United States v. Turkette,* 452 U.S. 576, 583, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981). Such an enterprise "is proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit." *Ibid.* The allegations in the complaint must connect the defendants with the enterprise. *Ray v. General Motors Acceptance Corp.,* No. 92–5043, 1995 WL 151852, at *2–3 (E.D.N.Y. Mar. 28, 1995). The plaintiff also must make out the underlying claim of wrongful or criminal conduct in order to establish that the defendants were engaged in an enterprise. *See Vennittilli v. Primerica, Inc.,* 943 F.Supp. 793, 799 (E.D.Mich.1996).

 The defendants contend that the enterprise element requires a showing of facts that establish an independent structure outside of the alleged racketeering activity and evidence of a chain of command or other evidence of a hierarchy. It is true that the "enterprise" and "pattern" elements are distinct. *Turkette,* 452 U.S. at 583, 101 S.Ct. 2524. But the rest of the defendants' argument is not supported by the case law.

In *Boyle v. United States,* 556 U.S. 938, 129 S.Ct. 2237, 173 L.Ed.2d 1265 (2009), the Supreme Court held that association-in-fact enterprises must have a structure with at least three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose. *Id.* at 946, 129 S.Ct. 2237. However, the Court clarified that this organizational structure need not be hierarchal; maintain role differentiation or operate a unique *modus operandi;* possess a chain of command; commit diverse and complex crimes; require membership dues or issue rules and regulations; commit uncharged or additional crimes aside from predicate acts; institute an internal discipline mechanism; schedule regular meetings regarding enterprise affairs; adopt an enterprise name; or conduct induction or initiation ceremonies and rituals. *Id.* at 948, 129 S.Ct. 2237. Following *Boyle,* the Sixth Circuit has observed that a defendant cannot easily challenge the existence of an enterprise, given "the Supreme Court's repeated admonitions that the term 'enterprise' like the RICO statute itself, should be interpreted broadly." *In re ClassicStar Mare Lease Litig.,* 727 F.3d 473, 492 (6th Cir.2013).

The plaintiffs have pleaded sufficient facts to establish an "enterprise." They allege that the defendants have a common purpose (to defraud investors through a scheme involving the purchase, sale, and management of foreclosed properties in the Detroit area); a relationship (Sameer Beydoun, Ali Beydoun, David Makki, and Kathy Messics supply fraudulent, forged leases to prospective buyers; the fraudulent lease documents are forged by defendants Sameer Beydoun, Kathy Messics, and George Vanderburg; defendants Sameer Beydoun, Ali Beydoun, David Makki, and Kathy Messics lie to the tenants about the conditions of the properties; and Chris Picciurro supplies false information about rental payments and amounts; and Tarek Baydoun performed fraudulent evictions in order to perpetuate the fraud); and longevity (the complaint alleges that the mis-

conduct occurred since at least 2011 and provides specific examples of efforts to cover up the fraud on nearly a dozen occasions).

■ The allegations of an enterprise also are sufficiently distinct from the pattern of racketeering activity. A discrete set of facts is not necessary, since "proof used to establish these separate elements may in particular cases coalesce." *Turkette,* 452 U.S. at 583, 101 S.Ct. 2524; *see also Ouwinga v. Benistar 419 Plan Servs., Inc.,* 694 F.3d 783, 794 (6th Cir.2012) (stating that "the evidence used to prove the pattern of racketeering activity and the evidence establishing an enterprise 'may in particular cases coalesce' ") (quoting *Boyle,* 556 U.S. at 947, 129 S.Ct. 2237). The Supreme Court has held that evidence of the pattern of activity may itself support the inference of an association-in-fact enterprise. *Boyle,* 556 U.S. at 952, 129 S.Ct. 2237 (holding that instructions allowing a jury to find an enterprise from evidence of its activity, as opposed to its structure, properly conveyed the holding in *Turkette* that "proof of a pattern of racketeering activity may be sufficient ·in a particular case to permit a jury to infer the existence of an association-in-fact enterprise"). Here, the complaint describes the defendants' specific roles and relationships, and alleges the enterprise functioned since at least 2011 for the common purpose to defraud and obtain money from the plaintiffs. Those allegations are sufficient to plead the element of an enterprise. *See Ouwinga,* 694 F.3d at 794–95.

### 3. Pattern of activity

■ The plaintiffs allege predicate acts of mail fraud and wire fraud. A person commits mail fraud if he devises a scheme to defraud, executes the scheme using the mail or causing it to be used, and acts with the intent to defraud. 18 U.S.C. § 1341;

*United States v. Jones,* 641 F.3d 706, 710 (6th Cir.2011). Wire fraud requires similar proof, except that instead of alleging use of the mail to execute the scheme, the plaintiff must allege that the person used or caused to be used a wire communication in interstate commerce in furtherance of the scheme. 18 U.S.C. § 1341; *United States v. Faulkenberry,* 614 F.3d 573, 582 (6th Cir.2010).

■ To plead a pattern of racketeering activity, the plaintiff must allege at least two predicate acts within ten years of each other, although that may not necessarily be sufficient. *Brown v. Cassens Transp. Co.,* 546 F.3d 347, 354 (6th Cir. 2008) (citing *H.J. Inc. v. Northwestern Bell Tel. Co.,* 492 U.S. 229, 238–43, 109 S.Ct. 2893). "[A] plaintiff [also] must show 'that the racketeering predicates are related, *and* that they amount to or pose a threat of continued criminal activity.' " *Ouwinga,* 694 F.3d at 795 (quoting *H.J. Inc. v. Nw. Bell Tel. Co.,* 492 U.S. 229, 237, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989)). "This requirement is known as the 'relationship plus continuity test.' " *Ibid.* (citing *Brown v. Cassens Transp. Co.,* 546 F.3d 347, 355 (6th Cir.2008)).

■ "The relationship prong is satisfied by showing the predicate acts have 'similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events.' " *Ibid.* (quoting *H.J. Inc.,* 492 U.S. at 240, 109 S.Ct. 2893). "A particular defendant's predicate acts are not required to be interrelated with each other; instead, the predicate acts must be connected to the affairs and operations of the criminal enterprise." *Ibid.* (citing *United States v. Fowler,* 535 F.3d 408, 421 (6th Cir.2008)). The predicate acts of mail and wire fraud alleged in this case are based on false and fraudulent purchase agreements, loan ap-

plications, verifications of deposit, lease agreements, and statements of income; using the telephone to disseminate fraudulent information to financial institutions and the plaintiffs; and transferring funds to the plaintiffs. Compl. ¶ 334. All predicate acts allegedly had the same purpose of defrauding and obtaining money from the plaintiffs, were directed toward the plaintiffs, and were presented to the plaintiffs through the same defendants. ¶ 333. The relationship prong is satisfied. *See Ouwinga,* 694 F.3d at 795.

■■ "The continuity prong of the test is satisfied by demonstrating either 'a close-ended pattern (a series of related predicate acts extending over a substantial period of time) or an open-ended pattern (a set of predicate acts that poses a threat of continuing criminal conduct extending beyond the period in which the predicate acts were performed).'" *Ibid.* (quoting *Heinrich v. Waiting Angels Adoption Servs.,* 668 F.3d 393, 409–10 (6th Cir. 2012)). "In other words, the continuity prong 'is sufficiently established where the predicates can be attributed to a defendant operating as part of a long-term association that exists for criminal purposes.'" *Ibid.* (quoting *H.J. Inc.,* 492 U.S. at 242, 109 S.Ct. 2893).

The defendants contend that the allegations of a threat of continuing criminal conduct are vague and conclusory. But they have not cited the governing precedent accurately, omitting the proposition that continuity can be shown through longevity. Even if the allegations of continuing misconduct are insufficient, the plaintiffs have alleged a pattern of misconduct involving nearly a dozen properties over a long period of time. That is sufficient to satisfy the continuity element.

The RICO count is pleaded adequately as to the Metro Property defendants, the Beydoun defendants, and the Beydoun Law defendants.

### G. Count IV: Breach of implied contract/quasi-contract/unjust enrichment

■■ The defendants argue that the implied contract claim fails as a matter of law because the parties signed an express contract and cannot plead claims for both breach of contract and implied contract. That is not exactly correct. A party cannot *recover* under theories of *quantum meruit* or unjust enrichment when a transaction is governed by a valid contract. *Morris Pumps v. Centerline Piping, Inc.,* 273 Mich.App. 187, 194–95, 729 N.W.2d 898, 904 (2006) (holding that "an implied contract may not be found if there is an express contract *between the same parties* on the same subject matter" (quoting 42 C.J.S., Implied and Constructive Contracts, § 34, p. 33)). But Federal Rule of Civil Procedure 8(a)(3) permits a pleader to include "a demand for the relief sought, which may include relief in the alternative or different types of relief."

■ Alternatively pleading an express contract and implied contract (whether styled as unjust enrichment or *quantum meruit*) is allowed when, for instance, there is a dispute between the parties as to whether an express agreement exists. *Cascade Elec. Co. v. Rice,* 70 Mich.App. 420, 426–27, 245 N.W.2d 774, 777 (1976) (finding that the plaintiff could bring both actions because the plaintiff performed work that was not contemplated under the express contract and the defendant disputed the existence of an express verbal contract). A party is not required to "elect to proceed under one theory or the other, but could seek recovery on the basis either of an express [ ] contract, or an implied contract if the [trier of fact] found that the express [ ] contract did not exist." *Id.* at 427, 245 N.W.2d at 777; *see also H.J.*

*Tucker & Assocs., Inc. v. Allied Chucker & Eng'g Co.,* 234 Mich.App. 550, 573, 595 N.W.2d 176, 188 (1999) (holding that a claim for unjust enrichment should not be dismissed because the court may find that the express contract was no longer in force). The plaintiff also may bring a breach of contract claim and an unjust enrichment claim in cases where the defendant has "kept its options open, and may deny the existence of a contract." *Terry Barr Sales Agency, Inc. v. All–Lock Co., Inc.,* 96 F.3d 174, 182 (6th Cir.1996) (holding that the plaintiff may proceed under a claim for breach of contract and unjust enrichment because the defendant "admitted the existence of a contract solely for the purposes of summary judgment").

▆▆▆ That is not the case here, though. The parties do not dispute the existence of the purchase agreements. A plaintiff can only plead breach of contract and implied contract claims in the alternative if there is doubt as to the existence of a contract. *Ford Motor Co. v. Ghreiwati Auto,* 945 F.Supp.2d 851, 871 (E.D.Mich.2013). "If the parties admit that a contract exists, but dispute its terms or effect, an action will not also lie for quantum meruit or implied contract. In other words, alternative pleading of an implied contract claim is only allowed in a contract setting where a party doubts the existence of a contract." *Advanced Plastics Corp. v. White Consol. Indus., Inc.,* 828 F.Supp. 484, 491 (E.D.Mich.1993) (citations omitted).

The plaintiffs attempt to work around this limitation by arguing that an implied contract claim is permissible because, if proven, the allegations of fraudulent misrepresentation would render the parties' contract void. But that does not render the contract doubtful or nonexistent. And by advancing this argument, it is the plaintiffs, not the defendants, who deny the existence of the contracts. Moreover, accepting the plaintiffs' position would conflate the tort and contract claims; if the plaintiffs succeed on their fraud claims, their remedy is in tort, not in quasi contract. Michigan courts have emphasized the importance of maintaining distinct boundaries between contract and tort remedies; "contract law and tort law are separate and distinct, and the courts should maintain that separation in the allowable remedies." *Huron Tool & Eng'g Co.,* 209 Mich.App. at 371, 532 N.W.2d at 544.

Count IV of the amended complaint will be dismissed.

H. Count XIII: Intentional infliction of emotional distress

▆▆▆ The defendants contend that the count alleging intentional infliction of emotional distress fails to state a claim for relief as a matter of law. Although the Michigan Supreme Court has not yet recognized the tort of intentional infliction of emotional distress, the Michigan Court of Appeals has consistently recognized it. *Mroz v. Lee,* 5 F.3d 1016, 1018 (6th Cir. 1993) (collecting cases). "Under Michigan law, a *prima facie* case for intentional infliction of emotional distress requires the following elements: '(1) extreme and outrageous conduct; (2) intent or recklessness; (3) causation; and (4) severe emotional distress.' " *Ruffin–Steinback v. de-Passe,* 267 F.3d 457, 464 (6th Cir.2001) (quoting *Andrews v. Prudential Secs., Inc.,* 160 F.3d 304, 309 (6th Cir.1998)). "The outrageous conduct requirement is satisfied only by conduct that is so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Liability arises, moreover, only where the distress inflicted is so severe that no reasonable man could be expected to endure it." *Andrews,* 160 F.3d at 309 (internal citations and quotations

omitted). "It is well accepted that intentional infliction of emotional distress claims may entirely appropriately be dealt with on summary judgment or in a motion to dismiss." *Miller v. Currie*, 50 F.3d 373, 377–78 (6th Cir.1995).

■ Count XIII of the complaint simply recites the elements of a claim for intentional infliction of emotional distress without any factual elaboration. One paragraph of that count incorporates by reference the earlier paragraphs in the complaint. But those allegations describe a fraud scheme that duped the plaintiffs into investing money in the Detroit residential real estate rental market. Those allegations, if true, would establish that the defendants' conduct was unlawful, and even criminal. But "[i]t is not enough that the defendant has acted with an intent that is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by 'malice,' or a degree of aggravation that would entitle the plaintiff to punitive damages for another tort." *Graham v. Ford*, 237 Mich.App. 670, 674, 604 N.W.2d 713, 716 (1999) (citing *Roberts v. Auto–Owners Ins. Co.*, 422 Mich. 594, 602–603, 374 N.W.2d 905 (1985)). The plaintiffs have not alleged conduct by the defendants that invokes the level of outrage necessary to plead a claim of intentional infliction of emotional distress under Michigan law.

## I. Counts VI and VIII (Corporate Officer Responsibility/Liability)

■ The individual defendants contend that the Court should dismiss count VI, "corporate officer responsibility/liability," against defendants Sameer Beydoun, Ali Beydoun, David Makki, Mike Alaweih, and Chris Picciurro. Dkt. # 36 at 28. The same argument is made as to count VIII by defendants John Allen, James Allen, and Tarek Baydoun. The Court

agrees. The plaintiffs insist that the defendants who are corporate officers may be held liable for their individual tortious conduct. That proposition is beyond debate. "Michigan law has long provided that corporate officials may be held personally liable for their individual tortious acts done in the course of business, regardless of whether they were acting for their personal benefit or the corporation's benefit." *Dep't of Agric. v. Appletree Mktg., L.L.C.*, 485 Mich. 1, 17–18, 779 N.W.2d 237, 246–47 (2010). "Moreover, as Michigan courts have recognized, '[o]fficers of a corporation may be held individually liable when they personally cause their corporation to act unlawfully.'" *Ibid.* (quoting *Livonia Bldg. Materials Co. v. Harrison Constr. Co.*, 276 Mich.App. 514, 519, 742 N.W.2d 140 (2007)).

■■ But "corporate officer responsibility/liability" is not a cause of action. It is not even a theory of liability, so stated. The individual defendants may be held accountable in tort for their personal conduct, and that conduct may render the various corporate defendants liable as well. But the complaint does not plead facts from which one might infer joint enterprise liability, in which the conduct of one defendant—corporate or individual—may be imputed to all the defendants. *See McLean v. Wolverine Moving & Storage Co.*, 187 Mich.App. 393, 399, 468 N.W.2d 230, 233 (1991). "A joint enterprise requires that every member have management and control of the enterprise, a right to be heard, and an equal right of control and joint responsibility for decision making and expenses." *Helsel v. Morcom*, 219 Mich.App. 14, 21–22, 555 N.W.2d 852, 855 (1996) (quotation marks and citations omitted). The complaint in this case says only that Sameer Beydoun, Ali Beydoun, David Makki, Mike Alaweih, and Chris Picciurro should be held personally responsible for

their "fraudulent, negligent, and/or egregious actions" and should be held liable for their "individual tortious acts against Plaintiffs." Compl. ¶¶ 290, 294. The same is true for defendants John Allen, James Allen, and Tarek Baydoun. Those vague allegations do not support a claim for joint enterprise liability.

The Court will dismiss counts VI and VIII for failure to state a claim upon which relief can be granted.

J. Count V (*Alter Ego* /Piercing the Corporate Veil) and Count VII: *Alter Ego* /Piercing the Corporate Veil (as to attorney defendants)

The individual defendants contend that count VII, "alter ego/piercing the corporate veil," fails as a matter of law because veil piercing is not a distinct cause of action, and the complaint pleads no facts that would support a finding that the corporate structures should not be respected. The same flaws apply to count V. An *alter ego* claim is based on the equitable doctrine that courts may sometimes disregard the formalities of business structures when those structures are misused for the purpose of avoiding a company's legal obligations. *See NLRB v. Allcoast Transfer, Inc.*, 780 F.2d 576, 579 (6th Cir.1986) (observing that the *alter ego* doctrine "prevent[s] employers from evading obligations ... merely by changing or altering their corporate form").

The plaintiffs allege that Metro Property Group, LLC, Metro Property Management, LLC, Global Power Equities, LLC, and Apex Equities, LLC were the *alter egos* of Sameer Beydoun, Ali Beydoun, and David Makki; and that Baydoun Law Group, PLLC and Allen Brothers, PLLC were the *alter egos* of John Allen, James Allen, and Tarek Baydoun. The allegations supporting those conclusions are that the individuals commingled their identities, finances, and business practices; they did not maintain separate identities; and they failed to observe internal legal formalities. The plaintiffs argue that the Court should disregard the "corporate fiction" and hold the individuals responsible for the legal obligations of the limited liability companies.

Under Michigan law, separate corporate structures are not "fictions"; instead, there is a presumption that the corporate form will be respected. *Seasword v. Hilti*, 449 Mich. 542, 537 N.W.2d 221, 224 (1995) (citing *Herman v. Mobile Homes Corp.*, 317 Mich. 233, 26 N.W.2d 757, 761 (1947)). "This presumption, often referred to as a 'corporate veil,' may be pierced only when an otherwise separate corporate existence has been used to 'subvert justice or cause a result that [is] contrary to some overriding public policy.'" *Ibid.* (alteration in original) (quoting *Wells v. Firestone*, 421 Mich. 641, 364 N.W.2d 670, 674 (1984)).

A plaintiff seeking to penetrate a corporate structure and access individual shareholders' assets must plead facts that show that (1) the corporate entity is a mere instrumentality of another entity or individual; (2) the corporate entity was used to commit a fraud or wrong; and (3) the plaintiff suffered an unjust loss. *Nogueras v. Maisel & Assocs. of Mich.*, 142 Mich.App. 71, 86, 369 N.W.2d 492, 498 (1985). A court, in considering whether an entity is used as a mere instrumentality, may consider factors such as "undercapitalization of the corporation, the maintenance of separate books, the separation of the corporate and individual finances, the use of the corporation to support fraud or illegality, the honoring of corporate formalities, and whether the corporation is merely a sham." *Laborers' Pension Trust Fund v. Sidney Weinberger Homes, Inc.*, 872 F.2d 702, 704–5 (6th Cir.1988).

■ The defendants contend that the plaintiffs have alleged insufficient facts to support a claim to pierce the corporate veil. They are correct. The only fact alleged throughout counts V and VII, other than the respective ownership of the limited liability companies, is that the Allen Brothers removed Tarek Baydoun's name from the "of counsel" designation on the Allen Brothers's website. All the other allegations are merely a recital of the factors courts consider in an *alter ego* claim, with no supporting facts. "The[se] allegations are conclusory and not entitled to be assumed true." *Iqbal*, 556 U.S. at 681, 129 S.Ct. 1937. As the Sixth Circuit recently held in *16630 Southfield Ltd. Partnership v. Flagstar Bank, F.S.B.*, 727 F.3d 502, 504 (6th Cir.2013), "the sufficiency of a complaint turns on its 'factual content,' requiring the plaintiff to plead enough 'factual matter' to raise a 'plausible' inference of wrongdoing." The conclusory allegations in counts V and VII are merely " 'naked assertions devoid of further factual enhancement' [that] contribute nothing to the sufficiency of the complaint." *Id.* at 506 (quoting *Iqbal*, 556 U.S. at 678, 129 S.Ct. 1937).

■ The plaintiffs also allege that Tarek Baydoun is the sole member of Baydoun Law Group; PLLC d/b/a/ The Meridian Law Group. They also allege that Sameer Beydoun, Ali Beydoun, and David Makki are the sole owners, officers, and directors of Metro Property Group, LLC, Metro Property Management, LLC, Global Power Equities, LLC, and Apex Equities, LLC. However, "Michigan courts typically consider corporations legally distinct from their shareholders, even if a single shareholder owns all the stock." *Dept. of Consumer Indus. Servs. v. Shah*, 236 Mich. App. 381, 393, 600 N.W.2d 406 (1999) (citing *Bourne v. Muskegon Circuit Judge*, 327 Mich. 175, 191, 41 N.W.2d 515 (1950)).

"The same holds true for professional corporations." *Ibid.* (citing *Kline v. Kline*, 104 Mich.App. 700, 305 N.W.2d 297 (1981)).

The complaint contains no facts to support an *alter ego* theory of liability either in count V or VII.

## IV.

Paragraphs 59 through 62 of the complaint contain immaterial allegations that have no bearing on the subject matter of the litigation. Those paragraphs will be struck.

The plaintiffs have pleaded valid claims based on the allegations of fraud relating to the sale of the rental properties. However, the complaint fails to state claims of breach of contract, except with respect to the post-sale management contracts. Similarly, the plaintiffs have not successfully pleaded claims for conversion, unjust enrichment and quasi contract, violation of the Michigan Unfair Trade Practices and Michigan Consumer Protection Acts, intentional infliction of emotional distress, corporate officer responsibility, and *alter ego* liability.

Accordingly, it is **ORDERED** that the defendants motions to strike and dismiss the complaint [dkt. # 35, 36, 59, 77] are **GRANTED IN PART AND DENIED IN PART.**

It is further **ORDERED** that counts IV (breach of implied contract), V (alter ego/piercing the corporate veil), VI (corporate officer responsibility/liability), VII (alter ego/piercing the corporate veil as to the attorney defendants), VIII (corporate officer/responsibility liability as to the attorney defendants), IX (common law conversion), X (statutory conversion), and XI (Unlawful Trade Practices and Michigan Consumer Protection Act), and XIII (intentional infliction of emotional distress) of

the complaint are **DISMISSED WITH PREJUDICE.**

It is further **ORDERED** that count III of the complaint alleging breach of the sales contracts is **DISMISSED WITH PREJUDICE,** but the plaintiffs may proceed under that count on their claims for breach of the management contracts as to defendant Metro Property Management, LLC, **ONLY.**

It is further **ORDERED** that all counts of the complaint are **DISMISSED WITH PREJUDICE** against defendants James Allen, John Allen, and Allen Brothers Attorneys and Counselors Professional Liability Company.

It is further **ORDERED** that counts I and II of the complaint are **DISMISSED WITH PREJUDICE** against defendant Tarek Baydoun.

It is further **ORDERED** that the motions are **DENIED** in all other respects.

It is further **ORDERED** that counsel for the parties attend a case management conference on **June 4, 2014 at 3:00 p.m.**